Waring v. Mason.

---

H. & H. P. WARING *vs.* E. W. MASON, *executrix* of A. Mason, who was impleaded with G. GALLAGHER.

In a *sale by sample* of cotton, the law implies a *warranty* that the bulk of the article corresponds in quality with the sample exhibited: where, therefore, cotton was sold in bales, and the sample exhibited was of cotton of good quality, and on opening the bales it was found that they were packed in the interior with masses of damaged cotton, *it was held,* that the purchaser was entitled to recover the damages sustained by him.

The mere exhibition, however, of samples at the time of sale, is not of itself evidence of an agreement to sell by sample; it is for a jury to say under all the circumstances of the case whether the sale was *intended* by the parties as a sale by sample.

The vendors in such case, selling in their own names, are not exempted from liability to the purchasers on the ground that in the sale they acted merely as the *agents of* [426] *others,* and were generally known as commission merchants; to relieve themselves from responsibility, they should have disclosed the names of their *principals.*

Parol evidence of a sale by sample is admissible, although the broker who effected the sale made an entry thereof in his books without mentioning that it was a sale by sample; it not having been signed by the broker, and a *bought and sold note* not having been delivered by him to either of the parties.

In a case of breach of warranty in the sale of chattels, it is not necessary, to entitle the purchaser to recover the damages sustained by him, that he return or offer to return the article sold. If he wishes to *rescind the sale* and to recover back the whole price paid, he must return or offer to return the property within a reasonable time; but not otherwise.

The difference in the rules of the *civil law* and the *common law* in respect to *implied warranties* on the sale of personal chattels stated and commented on.(a)

ERROR from the supreme court. Gallagher and Mason brought an action of assumpsit against the Messrs. Waring, to recover the damages sustained by them in the purchase from the defendants of 50 bales of cotton. The *first count* of the declaration charged a sale of the cotton *by sample*, and alleged by way of breach, that the cotton was not of the *like goodness* and *quality* with the samples exhibited, but was inferior thereto; being bad, damaged, dry, and rotten. The second count set forth a *warranty* that the cotton was *good, merchantable*, and *free from damage*, and alleged a breach of the warranty. On the trial the following facts appeared: The defendants were the holders of a quantity of cotton; they had permitted a broker to take samples and had given him their prices. The broker applied to the plaintiffs to make a purchase, and exhibited the samples which he had, being of good quality, very clean and white, and stated the price. The plaintiffs agreed to purchase 50 bales at 9 cents per lb., *if the cotton was equal to the samples exhibited,* and desired the broker to draw fresh samples, who accordingly drew

(a) The CHANCELLOR and *Senator* PAIGE, in the opinions delivered by them in this case, *dissent* from the intimation of opinion by Chief Justice NELSON, when this case was in the supreme court, that a sale of cotton in bales, not open to the inspection of the purchaser, raised an implied warranty that the article was *merchantable* and free from damage.

Waring *v.* Mason.

fresh samples, which corresponded with those first taken. When the broker [427] exhibited to the plaintiffs the samples last taken, they agreed to take the cotton. The plaintiffs paid for the cotton, at the price stipulated, the sum of $1426.05. The cotton was shipped from the store of the defendants, in the city of *New-York,* on board a brig bound to *London,* and arrived in safety at the latter port. The defendants were *commission merchants* in the sale of cotton. At the time of the sale to the plaintiffs, nothing was said as to *who* were the *real owners* of the cotton. Both parties resided in New-York, and it was well known among merchants there that the defendants dealt in cotton as commission merchants; but there was no proof that the plaintiffs knew that the defendants dealt in cotton on *consignment only.* The broker stated that he made a memorandum of the sale, which he afterwards transferred to his brokerage book, which on diligent search he had not been able to find; he, however, testified that no entry was made by him that the cotton was sold by sample; that he never made such an entry; that nothing is said in the entry about sale by sample, though the sale be so in fact. That the entry in his book charged both parties with brokerage, but that it is not the practice to receive brokerage from both purchaser and seller; that he always received pay from the purchaser. A bill of parcels was given in evidence, furnished by the defendants on the sale of the cotton, which contained no reference to a sale by sample; it was made out in the names of the defendants as vendors. The plaintiffs produced evidence taken under a commission in *London,* proving that the cotton in question was falsely packed with large dry masses of damaged cotton in the interior of the bales; also proving the custom of London, and showing the sales of the cotton, and the amount of damages sustained by them. The defendants moved for a nonsuit on various grounds, which was denied by the presiding judge; to which decision the defendants' counsel excepted. The jury found a verdict for the plaintiffs for $645.05, damages. The defendants applied to the supreme court for a new trial, which was refused, for the reasons assigned by the court on granting a new trial in this [428] same cause, when the plaintiffs on a former trial had been nonsuited. (See 9 *Wendell,* 20.) Judgment having been entered for the plaintiffs on the verdict, the defendants sued out a writ of error.

The cause was argued in this court by

*N. F. Waring and B. F. Butler,* (attorney-general of the United States,) for the plaintiffs in error.

*J. L. Mason,* for the defendant in error.

*Points insisted on in behalf of plaintiffs in error:*

*First.* There was no evidence to sustain either count of the declaration, and the motion for a nonsuit should therefore have been granted.

1. The first and third counts allege a sale by sample, and a warranty that the bulk of the article should be of the like goodness and quality with the samples exhibited. Supposing it to have been proved that the sale was by sample, yet as no fraud was pretended, and as it was not proved that the vendors *intended* the exhibition of the samples as a warranty, or had any *particular knowledge of the contents of the bales,* and as the contrary appeared, no warranty whatever can be implied, or at most only a warranty that the bales contained cotton of the *kind* exhibited, and not as to the *goodness* or *quality* of the article. (*Seixas* v. *Wood,* 2 *Caines,* 48. *Snell* v. *Moses,* 1 *Johns. R.* 96. *Oneida Manuf. Co.* v. *Lawrence,* 4 *Cowen,* 440. 2 *Kent's Com.* 478, 9, *and note c,* 481, 3d ed., *and the cases there cited,* 1 *id.* 478. *Sweet* v. *Colgate,* 20 *Johns. R.* 196. *Conner* v. *Henderson,* 15 *Mass. R.* 319. 1 *Johns. R.* 275. 5 *id.* 395. *Myer* v. *Everth,* 4 *Campb.* 22. *id.* 144. *Parkinson* v. *Lee,* 2 *East,* 314. *Hart* v. *Wright, Supr. Ct. N. Y., May term,* 1837. *Bradford* v. *Manly,* 13 *Mass. R.* 139. *Hastings* v. *Levering,* 2 *Pick.* 214. *Borrekins* v. *Bevans,* 3 *Rawle,* 23.)

2. The sale, under the circumstances of the case, was not a sale by sample, implying a warranty of any description on the part of the plaintiffs in error.

Waring v. Mason.

1. The memorandum made by the broker in his book is equivalent to a bought and sold note, and neither that nor the bill of parcels contains any [429] reference to the samples. These are the only evidences of the contract, and parol testimony to enlarge or vary it was inadmissible. (*Bailey and Bogart v. Ogden,* 3 *Johns. R.* 403 ; 2 *Caines,* 118 ; 12 *Johns. R.* 102 ; 14 *id.* 492 ; 8 *Cowen,* 215 ; 3 *Wendell,* 459.) 2. The broker in concluding the sale, was the agent of the purchasers exclusively ; and the sale was made on the samples drawn by him at their request, and not on the samples first exhibited by the broker. (*Lord Raym.* 118 ; 4 *Cowen,* 44.) 3. The plaintiffs in error were not the owners of the cotton, but merely consignees and agents for the sale of it, which was known to the purchasers, who had an opportunity, equally with the defendants, to inspect the article. The doctrine of *caveat emptor* therefore applies. (2 *Caines,* 48 ; *Snell* v. *Moses,* 1 *Johns. R.* 96 ; *Perry* v. *Aaron, id.* 421 ; *Holden* v. *Dakin,* 4 *id.* 421 ; *Davis* v. *Meeker,* 5 *id.* 354 ; *Sands* v. *Taylor, id.* 414 ; 20 *id.* 198 ; *Andrews* v. *Kneeland,* 6 *Cowen,* 554 ; *Welch* v. *Carter,* 1 *Wendell,* 185 ; 2 *Kent's Comm.* 3d ed. 478, 481 ; 10 *Mass. R.* 199.)

3. The second count alleges a sale on a warranty that the bales contained good merchantable cotton and free from damage. There was no proof of any express warranty to this effect, nor of any circumstances implying such a warranty. (2 *East,* 314 ; *Long on sales,* 122, 128 ) :

*Second.* In this case the cotton ought to have been returned, or notice of its defect given, before it was put beyond the reach or inspection of the seller. (2 *H. Black.* 573 ; 2 *Com. on Con.* 279, 282, *and the authorities there cited;* 1 *Starkie's R.* 257, 385, 477 ; *Vanderhost* v. *McTaggart,* 2 *Bay,* 498.)

*Third.* The testimony taken under the commission in regard to the custom of London, was inadmissible, and ought to have been rejected.

*Fourth.* The circuit judge should have left it to the jury to decide, as a question of fact, whether or not the sellers *intended,* by the exhibition of the samples, to warrant that the whole was of the like *goodness* and *quality;* and should have instructed the jury, in the event of their determining that question in [430] the negative, to find a verdict for the plaintiffs in error. (*Cases cited above; Bradford* v. *Manly,* 13 *Mass. R.* 139 ; *Andrews* v. *Kneeland,* 6 *Cowen,* 354.)

*Fifth.* The circuit judge should have left it to the jury to decide, as questions of fact, whether or not the purchasers had notice that the plaintiffs in error were merely consignees and agents for the sale of the cotton, and whether or not the purchasers had equal opportunity with the sellers to inspect it ; and should have instructed the jury, in the event of their determining these questions in the affirmative, to find a verdict for the plaintiffs in error.

*Points insisted on in behalf of defendant in error :*

I. The sale of the cotton in this case was a sale by sample in the usual way in which such sales are effected. The authorities annexed to the second point are referred to in support of this point.

II. The plaintiffs in error, the vendors, are therefore liable for a want of correspondence between the sample and the bulk of the article, because, in such sales, the law implies a warranty that the article sold is of the same kind with the sample exhibited. (1 *Fonb.* 121 ; 2 *Black. Comm.* 451 ; *Sweet* v. *Colgate,* 20 *Johns. R.* 196 ; *Sands* v. *Crump,* 5 *id.* 395 ; *Oneida Manuf. Co.* v. *Lawrence,* 4 *Cowen,* 440 ; *Andrews* v. *Kneeland,* 6 *id.* 354 ; *Beebe* v. *Robert,* 12 *Wendell,* 413 ; *Boorman* v. *Johnston, id.* 566 ; *Bradford* v. *Manley,* 13 *Mass. R.* 139 ; *Hastings* v. *Levering,* 2 *Pick.* 214 ; *Williams* v. *Spafford,* 8 *id.* 250 ; *Borrekins* v. *Bevan,* 3 *Rawle,* 23 ; *Rose* v. *Beattie,* 2 *Nott & McCord,* 538 ; *Carnochan* v. *Gould,* 1 *Bailey,* 179 ; *Vanderhost* v. *McTaggart,* 2 *Bay,* 498 ; *Parkinson* v. *Lee,* 2 *East,* 314 ; *Klinitz* v. *Surry,* 5 *Esp. R.* 267 ; *Hibbert* v. *Shee,* 1 *Campb.* 113 ; *Parker* v. *Palmer,* 4 *Barn. & Ald.* 388 ; *Germain* v. *Burton,* 3 *Stark. N. P.* 32 ; *Chapman* v. *March,* 19 *Johns. R.* 290.)

III. The broker who effected the sale was employed by the plaintiffs in error

as their agent, and, as such, had authority to sell by sample. (*Andrews* v. *Kneeland*, 6 *Cowen*, 354; *Monte Allegra*, 9 *Wheaton*, 644.)

[431] IV. The entry of the broker in his book, relative to the sale in ques tion, was merely his charge for brokerage, and cannot therefore be con sidered as the contract, or evidence of the contract binding upon the parties. (*Cumming* v. *Roebuck*, 1 *Holt*, 172. *Peltier* v. *Collins*, 3 *Wendell*, 459. *Rowe* v. *Osborne*, 1 *Stark. R.* 140. *Long on Sales*, 116.)

V. Neither is the bill of parcels rendered by the plaintiffs in error to the purchasers, the contract, or evidence of the contract. (*Jones* v. *Bright*, 5 *Bing.* 533. *Bradford* v. *Manly*, 13 *Mass. R.* 139. *Borrekins* v. *Bevan*, 3 *Rawle*, 23. *Boorman* v. *Johnston*, 12 *Wendell*, 566)

VI. There is no evidence in the case that the plaintiffs in error did not own the cotton in question; or if they were not the owners, that the fact was communicated to the purchasers; and even were it proved that the plaintiffs in error did not own the cotton, and that the purchasers knew it, the liability of the plaintiffs in error, on a sale by sample, would not in the least be altered. (*Paley on Agency*, 292, *and cases cited.*)

VII. The obligations imposed by a sale of this kind are not and cannot be varied by the use which the purchaser makes of the article after it comes into his hands. The contract has all the incidents of a sale by sample, whether the com modity is consumed at home or sent abroad.

VIII It cannot, therefore, affect the liability of the vendor, that the purchaser has not returned the article sold. (2 *Starkie's Ev.* 645, 3d *Am. ed.*, *and cases cited in the notes. McAllister* v. *Reab*, 4 *Wendell*, 483. *Thornton* v. *Winne*, 12 *Wheaton*, 183. *Street* v. *Blay*, 2 *Barn. & Adolph.* 456. *Okell* v. *Smith*, 1 *Starkie*, 107.)

IX. Although the sale in the present case should be adjudged not to be a sale by sample, yet the purchasers being unable to examine the bulk of the cotton, the plaintiffs in error were bound to deliver a saleable article of the description contracted for, and they were therefore liable under the second count in the declaration. (*Bluett* v. *Osborne*, 1 *Starkie*, 384. *Laing* v. *Fidgeon*, 6 *Taunton*, 327. *Gardiner* v. *Gray*, 4 *Campb.* 144. *Bridge* v. *Wain*, 1 *Starkie*, [432] 504. *Gray* v. *Cox*, 4 *Barn. & Cress.* 108. *Jones* v. *Bright*, 5 *Bing.* 533.)

After advisement, the following opinions were delivered:

By the CHANCELLOR. The conclusion at which I have arrived in this case upon the subject of the sale by sample, renders it unnecessary for me to express any definitive opinion upon the question whether the evidence upon the trial was sufficient to have authorized a recovery upon that count of the declaration which stated a sale with warranty that the bales contained merchantable cotton, free from damage. There is unquestionably a very material difference between the rules of the civil law on the subject of implied warranties in sales, and the rules of the common law on the same subject; which last is the law of this state. By the civil law, if there were error either as to the substance of the thing which was intended to be sold or purchased, or as to any of its essential qualities, without which it would not be the article for which it was sold: as if a metal was sold for silver bullion, which afterwards turned out to be gold or brass; or if candlesticks were sold as silver and they afterwards turned out to be only plated, there would be no valid sale. (*Poth. on Obl. No.* 18. *Idem on Cont. of Sale, No.* 34.) But by the common law, the sale would be binding in such a case, unless the article sold was in such a situation that it could not be seen and examined by the parties. (*Seixas* v. *Wood*, 2 *Caines*, 48. *Sweet* v. *Colgate*, 20 *Johns. R.* 196.) By the civil law also, there was an implied warranty on the part of the vendor that the article sold was not only free from such defects as would render it unfit for the use for which it was purchased, but also that it was free from defects of a different kind which merely diminished its value below that of a sound article. In the first case the vendee might return the article, and rescind the sale by a redhibitory action

Waring v. Masor.

to recover back the price; and in the last case the *actio estimatoria* was given to enable him to recover the difference in value between the defective article and a sound one of the same kind. ( *Voet on the Pand. b.* 21, *tit.* 1, § 4, 5.) The vendor might, however, in either case, exempt himself [433] from liability, by an express stipulation to that effect, unless he was aware of the defect in the article and concealed the fact from the purchaser. (*Poth. on Cont. of Sale. No.* 182 ) By the law of Scotland, the purchaser is allowed to rescind the sale for a defect which renders the article *unfit* for the use for which it was purchased; but the principle of implied warranty against minor defects which merely *diminish* the value of the article, is disallowed, as hurtful to the interests of commerce. ( *Stair's Inst.* 80, 81; *Ersk. Inst. b.* 3, *tit.* 3, § 10; *Lindsay* v. *Wilson, in* 1771; *Morris. Dict. of Decis. Sale, No.* 68.) The general rules of the common law are directly the reverse of those of the civil law; it being a settled rule of the common law, with perhaps some few exceptions, that the vendor is not bound to answer for the quality or goodness of the article sold, unless he expressly warrant it to be of a particular quality, or to be sound and good; or knows it to be otherwise, and uses some disguise or art to deceive the purchaser, or represents the article to be different from what it in fact is. (2 *Black. Comm.* 450; 2 *Kent's Comm.* 479.) If there is anything to take the case of an ordinary sale of cotton, not sold by sample, out of the general rule of the common law where the bales have been fraudulently packed, so as to create an implied warranty which will cover such a defect, it must be upon the ground that it is impossible, in the customary mode of examining and selling cotton in the bale in this country, for the purchaser to ascertain the defect; that it is, therefore, not within the principle of the common law rule of *caveat emptor;* and that the interests of commerce require that there should be an implied warranty that the cotton is fairly packed, so that samples taken from the bales in the ordinary manner, will exhibit its real quality and condition. I am not prepared, however, to admit the existence of such a principle of law in this state.

A sale by sample, however, does not come within the principle of the common law, that the purchaser must look out for himself, as every [434] agreement to sell by sample does, from its very nature, contain an implied if not an express warranty, that the bulk of the article sold corresponds with such sample. But the mere showing of a sample of cotton to the purchaser at the time of the sale, is not of itself an agreement to sell the cotton by sample; although it amounts to a representation that the sample exhibited has been taken from the cotton offered for sale in the usual way. In this case, however, I think there was sufficient evidence to authorize the jury to find that the understanding of the parties was that the cotton was to be sold by the samples exhibited by the broker of the vendors. Mumford, the witness, testified that he was authorized by the vendors to take samples of their cotton, and he thinks one of them requested him to do so; they also furnished him with the price at which it was to be sold. There is no doubt, therefore, that he was their agent for the purpose of offering the cotton for sale, and they subsequently ratified the sale which he had made. If a man entrusts a servant or agent to sell for him, he is entrusted to do all that he can to effectuate the sale, and if in so doing he exceeds his authority, he still binds the principal. (*Ross' Law of Vend.* 156; *Hilyear* v. *Hawke,* 5 *Esp. R.* 72.) The language of the purchaser was, that he would take the cotton, if it was equal to those samples; and the bargain was concluded upon that understanding. It turned out afterwards that the bulk of the article was not equal to the samples; that the cotton was fraudulently packed with large dry masses of damaged cotton in the middle of the bales. As there was sufficient evidence to authorize the plaintiffs to go to the jury upon the question whether the understanding of the parties was that the cotton should be sold by the samples first exhibited, or those subsequently exhibited, which corresponded with the first in quality, the judge was right in refusing to nonsuit the plaintiffs; and we

Waring v. Mason.

must presume the case was submitted to the jury under proper instructions in other respects, as there is no exception to the charge of the judge.

There was nothing in the case to exempt the defendants from liability, [435] on the ground that they were merely acting as *commission merchants*, or as agents for some other person. As the cotton was sold in their own names, merely proving that they were generally known to the plaintiffs and others to be commission merchants, amounts to nothing, without also proving that commission merchants never buy or sell on their own account; and I presume no such custom could have been established. Besides, if they wish to protect themselves from responsibility as agents, they should not have sold in their own names; or at least they should have disclosed the name of their principal, if the cotton was not in fact theirs, so as to give the purchasers an action against him.

The *objection that the memorandum made by the broker in his books makes no mention of its being a sale by sample, is not well taken.* That memorandum was not signed by the broker, so as to make it binding on either party as a written agreement, even if he could be considered as the agent of both parties in making the sale; and a bought or sold note was not given by him to either of the parties. The entry was, therefore, a mere private memorandum of the broker, which was not binding on any one as a written agreement. Besides, this was not a case within the statute of frauds, so as to require the agreement to be in writing in order to make it binding upon the parties.

The fact that the cotton was *not returned* to the vendors, and that it was sent to a foreign country before the fraud was discovered, did not deprive the purchasers of their rights. From the very nature of the fraud in the packing, it could not be discovered without opening the bales; which, according to the commercial usage here, it would be unreasonable to require, as they must then have been repacked at a very great expense, before they would be in a proper situation for exportation. The opening of the bales in *Liverpool*, or in *London*, is a matter of but little importance to what it would be here, as the article is there within a very short distance of the places where the bales would have to be opened for use; and the cotton may be sent from London or Liverpool, to the places where it is to be manufactured, without the expense of repacking. [436] Even if a return of the article would be necessary in ordinary cases to enable a party to recover on a warranty, this case must from necessity form an exception to the rule, as the defect could not be discovered until it was too late to return the article. It is well settled, however, that in the case of an express warranty it is not necessary for the vendee to return or even offer to return the article sold, to enable him to recover the damages he has sustained by a breach of the warranty. If he wishes to rescind the sale and to recover back the whole price paid for the article, he must return or offer to return it within a reasonable time, but not otherwise. (*Fielder* v. *Starkin*, 1 *H. Black. R.* 17. 1 *Camp. N. P.* 194, *note a.*)

Upon the whole, although it is possible that the jury may have come to a wrong conclusion upon the question of fact, *whether there was an agreement or understanding* of the parties that this was to be a sale by sample, I am satisfied no principle of law has been violated by the decision of the judge who presided at the trial of this cause. I am of opinion, therefore, that the judgment of the supreme court should be affirmed.

By Senator MACK. It is a just and salutary rule that a sale perfected confessedly by the exhibition of a sample, where the purchaser has no means or opportunity of examining the article in bulk, should imply a warranty that the article shall not only be of the same kind, but of the average quality with the sample exhibited. There is much difficulty, however, in applying this rule to those numerous classes of sales and resales of products and manufactured articles, which are conducted through consignees and commission merchants. In these

Waring v. Mason.

the circumstances characteristic of each transaction, may well be permitted to govern. And in cases like the present, where no fraud or deception is pretended, and where the facts and circumstances justify doubt, it appears to me that the rule in question ought not to apply as it would rigidly against the *grower* or *manufacturer* of the article.

In this case it was held by the supreme court, and urged on the argu- [437] ment here, that the broker acted as the agent of the plaintiffs in error, authorized to sell the cotton by sample, and hence a warranty both as to kind and quality, should be strictly implied against them. According to the testimony of the broker, he was, *de facto,* as much the agent of the purchaser as of the seller. Indeed, such appears to be the capacity of a cotton broker. His province is to hunt up sellers as well as purchasers; and the purchaser, as a general rule, pays the commissions. He is sometimes employed or set in motion by the one party, and sometimes by the other, and acts frequently as the joint and confidential agent of both.

From a careful examination of the testimony, I deduce the following conclusions: 1. That the plaintiffs in error held the cotton for sale, on consignment, as commission merchants, known to be doing business as such exclusively. 2. That the cotton being of the growth of North Carolina, no samples accompanied the bales, and hence the consignees were not prepared or authorized by their principals to sell by sample or warranty. 3. That the broker, as is customary with those of his calling, for the purpose of securing customers in the way of his business, drew samples of the cotton, by permission of the consignees, which he exhibited, with others, to one of the plaintiffs below, soliciting him to purchase. 4. That the plaintiff (Gallagher) expressed a willingness to buy, if the cotton was equal to those samples; to ascertain which fact he directed other samples to be drawn by the broker, on the exhibition of which he " thereupon took the cotton."

Not wishing to be known in the transaction as the purchaser, the plaintiff chose to complete the purchase through the intervention of the broker, and took his own method of satisfying himself of the quality of the article. He had the same means of knowing or ascertaining the quality as had the vendors. A personal and more thorough inspection was in his power; or he might have required the vendors' *express warranty.* Declining or neglecting to do either, he took the article at his own risk, upon the faith of the *second samples* drawn [438] by his own direction, and upon the confidence reposed in a common agent between buyer and seller, whom he had thus constituted his own agent for the purposes of that transaction. Besides, the entry in the broker's book, and the bill of parcels from the Warings, superadded to these circumstances, would seem to justify the inference that there was a complete and satisfactory confirmation of the sale, implying no intention or understanding of warranty on the part of the vendors.

It may well be questioned whether it would be a sound rule of public policy (for such is the object of those laws which control individuals in their private transactions) that a sale by sample, taken from the bulk of an article, where the purchaser has as good an opportunity of seeing the process of extracting the sample, and knowing the quality of the article in bulk, as the vendor, should in all cases imply a warranty? Vast quantities of products and manufactures are continually passing through the hands of agents and commission merchants, consignees, and factors, who, from the nature and extent of their transactions, have little chance for examination; and it seems to me that it would be a harsh rule of law to hold them to an exact knowledge of the quality of every article, and exempt purchasers, who have more leisure, individually, to examine, and often greater skill to judge, from the exercise of that vigilance and caution, which nature itself exacts from the self-interest and sagacity of man. It appears to me that every sale and transfer of property, made in good faith and honesty of pur-

Waring v. Mason.

pose, where both parties may have an equal opportunity of ascertaining the quality and value of the article, should be final, and at the risk of the purchaser. If the law or the courts attempt to establish a different rule, if they undertake to remedy the discrepancies of trade and supply skill and discretion to purchasers, our judicial tribunals, modify and reform them as we may, will be able to do little else than to make and mend bargains between individuals.

In this case, I conceive, the parties bargained upon an equality, and with mutual good faith; that no warranty can be legally or equitably implied; [439] and if it could, the cotton having been sent beyond sea, where the actual defect and amount of damage could not well be ascertained, the plaintiffs are equitably absolved. The judgment of the supreme court should, therefore, be reversed.

By Senator PAIGE. The first question which I shall consider is, whether a sale by sample, *per se,* implies a warranty on the part of the vendor that the bulk of the commodity sold shall equal, in *quality* and goodness, as well as in *kind,* the samples exhibited. *Blackstone* lays down the rule, (2 *Black. Comm.* 451,) as follows : " With regard to the goodness of wares purchased, the vendor is not bound to answer, unless he expressly warrants them to be sound and good, or unless he knew them to be otherwise, and hath used any art to disguise them, or unless they turn out to be different from what he represented them to the buyer ;" in other words, the true rule is the one laid down in *Seixas* v. *Wood,* (2 *Caines,* 48,) and in *Sweet* v. *Colgate,* (20 *Johns. R.* 196,) that there must be either an express warranty or fraud to make the vendor answerable for the quality or goodness of the article sold.

There is, strictly speaking, but one species of implied warranty which can be deemed to exist on every sale of personal chattels, and that is, that the seller undertakes that the commodity he sells is his own. On sales of provisions, in case they prove unwholesome, the remedy to the purchaser seems to be given upon the ground of knowledge of the unsoundness in the seller, which the law presumes. (2 *Black Comm.* 165. 12 *Johns. R.* 468.) Where the article is purchased from the manufacturer, the law implies a like or similar undertaking on his part as would be implied in the employment of a mechanic, viz.: that the article shall be made in a skilful and workmanlike manner. In the case of the purchase of or agreement to purchase a commodity, where there is no opportunity for inspection or examination, as where it is distant from the place of making the contract, the contract may be regarded as executory, and if the article proves to be different from the vendor's representation, the purchaser would not be bound to re- [440] ceive or pay for it, because it is not the thing agreed to be purchased.

But I apprehend that in all cases, on the sales of personal chattels, whether by sample or otherwise, (with the qualifications or exceptions just adverted to,) where there is an opportunity for inspection by the purchaser, and there is no fraud in the seller, nor any express warranty, the rule *caveat emptor* applies, and if the article turns out not to be that which it was supposed to be, or to be inferior in quality or goodness, the purchaser must sustain the loss. If the purchaser does not choose to incur the risk of latent defects, or if he doubts the goodness of the article, he should insist upon an express warranty from the seller. The opportunity for inspection, in my judgment, is not to be determined by its convenience or inconvenience, but by its practicability. I see nothing in the sale of packed cotton which exempts it from the operation of this rule. Where the purchaser or his agent sees, or has the opportunity of seeing, the bags in which the cotton is packed, and of inspecting and examining the bulk of the commodity, and chooses to content himself with examining samples drawn in the usual manner from the bales, and afterwards it turns out that the quality of the bulk is inferior to the samples, he has no claim, either in law or sound morals, to require an innocent vendor to make good the difference in the value. There is no great difficulty, certainly no impossibility, in examining the bulk of the cotton, so as effectually

Waring v. Mason.

to detect any latent defect or hidden unsoundness. Indeed, in the case of *Andrews* v. *Kneeland*, (6 *Cowen*, 354,) Chief Justice Savage says, " it appears that the most usual sales of cotton were by inspecting the bulk, and that it was unusual to sell by sample."

This doctrine of implying a warranty, as to the quality and goodness of the article, in all sales by sample, appears to me to be an innovation upon the principles of the common law. It is an approximation towards the principles of the civil law, in relation to sales of personal chattels, which have no binding force in this state. By the civil law a sound price implies a warranty of soundness; the civil law is severe upon the seller, and makes him answerable for every latent defect, although not known to him at the time of the sale, and although he did not warrant against it. I confess that the well- [441] established principles of the common law, in relation to sales of personal chattels, possess greater attractions for me than those of the civil law. The former require the purchaser to inspect the article purchased, and to take notice of such particulars as are *within the reach of his observation and judgment*, and the vendor to communicate all defects within his knowledge and not apparent on inspection. The common law also allows the purchaser, if he does not wish to run the risk of latent defects, to provide himself an indemnity against such defects by requiring an express warranty from the vendor. The first case in the supreme court in which it was held that a sale by sample implied, *per se*, a warranty that the bulk of the commodity accorded in quality and goodness with the sample, was that of the *Oneida Manufacturing Company* v. *Lawrence*, (4 *Cowen*, 440.) But in that case Chief Justice Savage admits the existence of the well-settled rule " that in ordinary sales, when the vendee has an opportunity of examining the commodity, the vendor is not answerable for any latent defect, without fraud or an express warranty, or such a direct affirmation or representation as is tantamount to a warranty and not the expression of an opinion." I am aware of a previous *obiter dictum* of Judge Spencer, in *Sands* v. *Taylor*, (5 *Johns. R.* 395,) where he says he is " ready to admit that on sales by sample, there is an implied warranty that the sample taken in the usual way, is a fair specimen of the thing sold." The learned judge probably obtained this new principle from some of the then recent decisions of the English courts, the judges of which had not long previous to the decision in *Sands* v. *Taylor*, commenced a system of judicial legislation on the subject of sales of personal chattels, and had been attempting to inoculate the body of the common law with some of the principles of the civil law, which their predecessors had most perseveringly and inflexibly resisted. (*Hibbrt* v. *Shee*, 1 *Camp. N. P. R.*, 113, [1807].) Upon a review of the decisions upon this subject, I think it will be found that the remarks of Ch. J. Gibson, in *Borrekins* v. *Bevans*, 3 *Rawle*, 44, [1831],) are strictly just.

He says, speaking of the common law rule in regard to warranties, on [442] the sale of personal chattels : " It was unshaken as founded on the case of *Chandelor* v. *Lopas*, ( *Cro. Jac.* 4,) down to the case of *Parkinson* v. *Lee*, (2 *East*, 314 ;) since when a flood of innovations in England and some of our sister states has swept away all rule on the subject whatever." And he says that " the supreme court of the state of New-York seems to have fallen in with the current in declaring a direct affirmation to be an express warranty, or at least evidence of it to go to the jury ;" referring to the cases in 19 *Johns. R.* 290 ; 20 *id.* 190, and 4 *Cowen*, 44. (a) The recent English cases have not only gone the length of deciding that in all sales by sample there was an implied warranty that the bulk of the commodity should accord with the sample in quality and goodness; (*Hilbert* v. *Shee*, 1 *Camp.* 113 ; *Germaine* v. *Burton*, [1820,] 3 *Stark.* 32 ; 4 *Barn. & Ald.* 387, [1821 ;]) but also that the commodity shall be of a merchantable quality and saleable of the denomination mentioned in the contract;

_____

(a) Oneida Manufacturing Co. v. Lawrence.

Waring *v.* Mason.

(*Gardiner* v. *Gray*, 4 *Camp*. 144; *Jones* v. *Bright*, 5 *Bing*. 533, [1829];) and also that the vendor impliedly warrants that the article sold is fit for the purpose for which it is purchased. (5 *Bing*. 533, [1829.] *Laing* v. *Fidgeon*, 6 *Taunt*. 108, [1815.] *Okell* v. *Smith*, 1 *Starkie*, 108. *Bluett* v. *Osborne*, *id.* 384.) Several of these English cases, however, were sales by the manufacturer or were sales by samples where there was no opportunity for inspection. Of the former character were the cases of *Jones* v. *Bright, Laing* v. *Fidgeon*, and *Okell* v. *Smith*, and of the latter were the cases of *Hibbert* v. *Shee*, and *Gardiner* v. *Gray*.

A succinct review of the cases in the supreme court of this state, will, I think, satisfactorily show a departure from the principles of the common law, as settled on the 16th of April, 1775, which principles as then established were adopted as a part of the law of this state. In *Seixas* v. *Wood*, 2 *Caines*, 48, [1804;] *peachum* wood was sold for *braziletto*. The defendant had advertised the wood as braziletto, and had made out the bill of parcels for braziletto. Neither plaintiff or defendant knew it was peachum wood. It was picked out from other wood by the plaintiff's agent. No [443] fraud was imputed to defendant. It was held that there must be either a warranty or fraud to make the vendor liable; that a sound piece did not imply a warranty of soundness; and that the description in a bill of parcels was no warranty. The case of *Chandelor* v. *Lopas*, (*Cro. Jac.* 4,) was referred to by Justices Thompson and Kent, as a case decisive of the question. There, in selling a jewel, the seller affirmed it was a bezoar stone, when it was not; and it was held that no action lay unless the defendant knew it was not a bezoar stone, or had warranted it to be one. Kent, J., in the same case, says: " that without a warranty by the seller, or fraud on his part, the buyer must stand to all losses arising from latent defects, and that there is no instance in the English law of a contrary rule being laid down." He further says, that " in the case of *Parkinson* v. *Lee*, (2 *East* 314,) it was decided that a fair merchantable price did not raise an implied warranty, and that if there be no warranty and the seller sell the thing such as he believes it to be, without fraud, he will not be liable for latent defects; that the decisions of *Chandelor* v. *Lopas*, and *Parkinson* v. *Lee*, were two centuries apart, and the intermediate cases were to the same effect." The same principles were re-asserted in *Snell* v. *Moses*, (1 *Johns. R.* 96,) and in *Holden* v. *Dakin*, (4 *id.* 421, [1809].) In *Sands* v. *Taylor*, (5 *id.* 395,) a large quantity of Virginia wheat had been sold to the defendant, who was a malster and brewer, by sample. The sample, on experiment, was found to malt. The defendant received a part of the cargo, but finding some of it heated and unfit for malting, refused to receive the remainder, although it was as good as southern wheat generally is, and was merchantable and fit for making flour. The defendant examined the wheat by drawing a sample. The vendor brought an action to recover the price of the cargo of wheat, and recovered. Spencer, J., in that case says: " On the sale of a commodity, no action can be sustained for any difference in quality between the thing contracted for and the thing delivered, unless there be fraud or a warranty." Van Ness, J., held that the sale was not strictly a sale by sample, as the defendants examined the wheat for themselves when [444] they agreed to buy it. He says: " Whether the wheat would malt or not was probably unknown to both parties; and to say that either party contemplated a warranty that it would malt, is not supported by any one fact in the case." " If the defendants intended to hold the plaintiff liable for a defect which was equally unknown to both parties, it was incumbent upon them to have exacted an express warranty for that purpose." And he refers to the case of *Parkinson* v. *Lee*, and says that the principle upon which that case was determined has often been sanctioned by the supreme court. Kent, Ch. J., in the same case, says: " the sale by sample was not a warranty as to the soundness of the cargo, nor was it so understood by the parties." If the purchaser had not been willing to have taken upon himself the risk of the sound or unsound con-

dition of the wheat, he should have called on the plaintiff for a special warranty. The case of *Parkinson* v. *Lee* is a case in point in support of this doctrine." In *Sweet* v. *Colgate*, (20 *Johns. R.* 196, [1822],) it was held that on the sale of goods, the vendor is not answerable for their quality or goodness, unless there is an express warranty or fraud. In that case *kelp* was sold for *barilla*, both vendor and vendee supposing it was barilla. Before the sale the defendant inspected it, and a sample was exhibited at the time of the sale. It was held that no action lay against the vendor by the vendee, for the bad quality of the article purchased; that the common law rule of *caveat emptor* applied. Woodworth, J., in that case, says : "If the purchaser doubts the goodness of the article or does not choose to incur the risk of a latent defect, he may refuse to purchase without a warranty. In *Welch* v. *Carter*, (1 *Wendell*, 185,) the principle was re-asserted that where the purchaser views the commodity himself, and there is neither fraud nor warranty, the rule of *caveat emptor* applies. In this case a fraudulent preparation, of no value, was sold for Alicant barilla. The defendant examined the article, and it was held by Sutherland, J., that to maintain an action for selling one article for another, there must be either warranty or fraud. He says : " A vendee has it always in his power to guard against any latent defect or deception in the article purchased, by exacting a warranty from the vendor." In the case [445] of the *Oneida Manufacturing Company* v. *Lawrence*, (4 *Cowen*, 440,) it was held that in the case of a sale by sample, there was an implied warranty that the quality of the bulk of the commodity shall be equal to the sample shown. This was a case of a sale of cotton by sample. The defendants declared that the cotton was good upland cotton, and that the samples exhibited were true samples. The cotton was inferior to the samples, being foul and damaged. Savage, Ch. J., in this case, says: " that although the plaintiff's agent saw the bags in which the cotton was packed, yet he had no opportunity of inspecting the bulk of the commodity." In *Andrews* v. *Kneeland*, (6 *Cowen*, 354,) the sale was of cotton by sample, and it was there again held, that in case of a sale by sample, the vendor is responsible that the bulk of the commodity shall be equal in quality to the sample. A similar decision was made in *Beebe* v. *Robert*, (12 *Wendell*, 413.) In *Parkinson* v. *Lee*, (2 *East*, 314, [1802],) it was held, upon a sale of hops by sample with a warranty that the bulk of the commodity answered the sample, that the law did not raise an implied warranty that the commodity should be merchantable, although a fair merchantable price was given; and that therefore the seller was not answerable for a latent defect unknown to him, and without fraud on his part. In that case the plaintiff and defendant were both dealers in hops. Five pockets of hops were purchased from the defendant by the plaintiff, warranted to answer the samples by which they were sold. Owing to the grower of the hops having fraudulently watered them after they were dried, before they were purchased by the defendant, (a fraud of which the defendant was ignorant,) one of the pockets, after the purchase by the plaintiff, became so much heated as to become unsaleable. Gross, J., held " that there was no implied undertaking in law that the commodity should be merchantable." " If the purchaser did not choose to incur the risk of any latent defect, he should have insisted on a warranty." Lord Mansfield said, " there either must be an express warranty of soundness, or fraud in the seller, to maintain the action." Le Blanc, [446] J., concurred with his brethren, although he believed that the defect was of such a nature that no inspection of the thing could have led to a discovery of it. Lawrence, J., likened the case to a sale of a horse, where it is admitted that the seller must stand to all latent defects. Le Blanc, J., distinctly intimates, that if the defect had been such as was discoverable by inspection, no question could have been raised as to the responsibility of the vendor. The learned judge who delivered the opinion of the supreme court in this case, supposes that this case of *Parkinson* v. *Lee*, did not conflict with the decision of that court, for the reason that at the time of the sale the bulk of the article had not

Waring v. Mason.

become unsaleable, by means of the latent defect which then existed, although at a future day such defect did render the hops unsaleable. The soundness of this distinction I cannot appreciate. The sample was sound and continued so, but the bulk of the commodity, as well at the time of the sale as afterwards, was unsound in consequence of the latent defect which pervaded the whole mass, but had not had sufficient time to develop itself. The 'sample could not, therefore, be said to answer fairly to the bulk of the commodity. Without any express warranty, the law, as settled in the present case in the supreme court, would, upon the facts of the case of *Parkinson* v. *Lee*, have implied a warranty on the part of the vendor against the latent defect existing in the hops at the time of the sale, and which subsequently rendered them unmerchantable. But it is seen that upon the same facts, with the addition of an express warranty that the bulk of the commodity answered the sample, the court of king's bench, in 1802, held that the common law did not raise an implied warranty on the part of the vendor that the commodity should be merchantable. I am constrained, therefore, to conclude that the decision of the supreme court, in the case now under consideration, as well as in the cases of the *Oneida Manuf. Company* v. *Lawrence*, of *Andrews* v. *Kneeland*, and of *Beebe* v. *Robert*, are in direct conflict with the case of *Parkinson* v. *Lee*.

In this case the plaintiffs below had an opportunity of examining the bulk of the cotton in the bales, if they had thought proper to do so. The cotton broker is to be regarded as the agent of both the seller and purchaser. (12 *Johns. R.* 102.) Both parties were ignorant of the unsoundness of the cotton, and the purchaser did not think proper to insist upon an express warranty. In my judgment, therefore, although this was a sale by sample, there is nothing in the case to take it from the general rule, that where there is neither an express warranty, nor fraud on the part of the vendor, he is not answerable for the quality or goodness of the article sold. Neither can I assent to the proposition that there was any implied undertaking, on the part of the defendants, that the cotton should be of a merchantable quality and saleable, inasmuch as the purchase was not from the manufacturer or producer, and as the plaintiffs had an opportunity of examining the article. (2 *East*, 314.) I am satisfied also, for another reason, that the judgment of the supreme court ought to be reversed. There is no evidence in the case to convince me that the defendants below intended to make any warranty as to the quality and goodness of the cotton; and without such evidence there can neither be an express nor an implied warranty. (2 *Caines*, 55. 19 *Johns. R.* 290. 20 *id.* 196. 4 *Cowen*, 440.) "To make an affirmation at the time of the sale a warranty, it must appear by the evidence to be so intended, and not to have been a mere matter of judgment and opinion, and of which the defendant had no particular knowledge." (2 *Caines*, 55, *Kent, J.*) In this case, at most, there was only a symbolical affirmation. Such an affirmation, certainly, cannot be more effectual than an express affirmation; and the latter could only have been regarded as a mere matter of judgment and opinion, of which the seller had no particular knowledge and no other knowledge than the purchaser possessed.

By re-establishing the old common law rule, I apprehend we will more generally carry into effect the intention of the parties. The justice and propriety of this rule is enforced by *Fonblanque*. He says, (1 *Fonb. Eq.* 380, *n.*:) "To excite that diligence which is necessary to guard against imposition, and to secure that good faith which is necessary to justify a certain degree of confidence, is essential to the intercourse of society. These objects are attained by those rules of law which require the purchaser to apply his attention to those particulars which may be supposed to be within the reach of his observation and judgment; and the vendor to communicate those particulars and defects which cannot be supposed to be immediately within the reach of such attention. If the purchaser be wanting of attention to those points where attention would have

been sufficient to protect him from surprise or imposition, the maxim, *caveat emptor*, ought to apply; but even against this maxim he may provide by requir ing the vendor expressly to warrant that which the law would not imply to be warranted." If we adhere to the old rule, as established in *Seixas* v. *Wood* and in *Parkinson* v. *Lee*, the seller will not be surprised by an implied warranty when he had no intention of making any, and the purchaser will not be enabled to obtain an article for a less price than he would have done if he had equired an express warranty, and at the same time to derive all the bene fits of such warranty, contrary to the understanding and intention of the parties. Both parties will understand that the purchaser, in the event of any latent defect or unsoundness in the article purchased, must bear the loss, unless he exacts an express warranty from the seller, or can show fraud on his part.   Where no im position or deceit is practised on the part of a vendor of a personal chattel, and no warranty is required of him by the purchaser, I cannot see that any rules of fair dealing or sound morals require the vendor to make good the loss to the pur chaser, in case the article turns out to be inferior in quality or unsound.

My opinion, therefore, is, that the judgment of the supreme court ought to be reversed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* Senators DOWNING, McLEAN, MACK, PAIGE, TALL-MADGE—5.

*In the negative:* The PRESIDENT of the Senate, The CHANCELLOR, *Senators* ARMSTRONG, BECKWITH, EDWARDS, FOX, HUNTER, HUNTINGTON, JOHNSON, H. F. JONES, LACY, SAWYER, LIVINGSTON, LOOMIS, MAISON, [449] SPRAKER, STERLING, VAN DYCK, WAGER, WILLES—20.

Whereupon the judgment of the supreme court was AFFIRMED.